IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEROME JUSTIN SPENCER           :           CIVIL ACTION
                                :
          v.                    :
                                :
BLOOMINGDALE'S                  :           NO. 17-3775

MEMORANDUM

Bartle, J.                                November 15, 2018

Plaintiff Jerome Justin Spencer brings this action against defendant Bloomingdale's for violation of his civil rights under 42 U.S.C. §§ 1981 and 1982.  Before the court is the motion of Bloomingdale's for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  We view the facts and draw all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  Summary judgment is granted where

there is insufficient record evidence for a reasonable factfinder to find for the nonmovant.  See Anderson, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id.  In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II

Spencer, who is African American, perceives that he was subjected to surveillance by Bloomingdale's security personnel on eight occasions while shopping at the Bloomingdale's store in King of Prussia, Pennsylvania.  On each occasion, Spencer made purchases and/or returns at Bloomingdale's and was neither refused any specific transaction nor asked to leave the store by any Bloomingdale's employee.  He also was never stopped, detained, searched, questioned, or otherwise accused of theft or other criminal activity by anyone employed by Bloomingdale's.

On November 5, 2016, Spencer shopped at the Bloomingdale's store in King of Prussia, Pennsylvania.  He first arrived at the store in the morning and then returned for a

second shopping trip in the late afternoon.  During both trips

Spencer made purchases in various departments in the store.

While shopping, Spencer states he was followed throughout the

Men's Department by a large male in a polo shirt and jeans, who

he believes was a member of Bloomingdale's Asset Protection

Department.[1]  This employee maintained a distance of three to

five feet from Spencer.  Spencer also reports that an African

American sales associate at the cash register closely monitored

him from ten to fifteen feet away and did not offer him any

assistance.

On Saturday November 26, 2016, Spencer was shopping in

the Gadgets Department of Bloomingdale's.  While doing so he was

monitored by an older, heavyset African American Bloomingdale's

employee.  Spencer was also followed for several minutes by a

Bloomingdale's sales associate who attempted to converse with

Spencer.  When Spencer went to the cash register to make a

purchase, he was told by the sales associate that the price

marked, $12.99, was not the price appearing in the system and

that the item was $19 or $20.  After several minutes of

discussion, the sales associate honored the ticketed price and

the sale was completed.

---

1.  For purposes of this motion, we will assume that the
individuals described by Spencer were in fact employees of
Bloomingdale's.

Spencer then made several more purchases throughout Bloomingdale's. Throughout this time, he was followed by a Caucasian male who Spencer believes was a Bloomingdale's Asset Protection employee. That employee watched Spencer from approximately five feet away while Spencer took a cell phone call near the store entrance. Later, while shopping in the Shoe Department, Spencer returned all the items he had purchased that day and, with the assistance of a Caucasian Bloomingdale's employee named Bruce Ridgeway, repurchased the items at a 20% discount using a Bloomingdale's coupon. Spencer states that other Bloomingdale's employees had failed to offer this discount to him, but it cannot be disputed that the coupon was valid only for purchases of $250 and greater and that Spencer had not reached that amount until he made his purchase in the Shoe Department. Afterwards, Spencer decided to leave Bloomingdale's rather than shop in the Children's Department for his niece because he did not feel comfortable in the store.

Following this experience, Spencer completed a Bloomingdale's online customer satisfaction survey wherein he stated that he had been profiled at the King of Prussia store on more than one occasion. In that same survey, he praised Ridegway, the Bloomingdale's employee who had offered Spencer the 20% discount. Several days later, Spencer received a call from a Bloomingdale's sales associate in the Men's Department.

According to Spencer, that associate was dismissive of Spencer's complaint.

On December 5, 2016, Spencer again went to Bloomingdale's. During this shopping trip Spencer made several purchases and returns. Spencer reports that throughout this trip he was monitored by Ridgeway. Ridgeway stood by the register next to another sales associate while Spencer made returns in the Children's Department. At the same time, another Bloomingdale's employee abruptly came onto the sales floor from a back room in the store. This employee walked past Spencer at a distance of four or five feet and looked at Spencer for three to four seconds. Based on his prior experience as a retail employee for Neiman Marcus and other companies, Spencer explains that this is a lost prevention tactic designed to startle a customer who is suspected of engaging in theft. After that Spencer left the store, and he is "sure [he] would have purchased more" were it not for these incidents.

On December 26, 2016, Spencer again made several purchases at Bloomingdale's. While in the fitting room, he heard the whispering of several people outside the room where he was changing. Spencer could not discern what was being said. He believed that these individuals were Bloomingdale's employees but admits that he never saw anyone.

On December 28, 2016, Spencer returned to Bloomingdale's and made several purchases. While shopping in the Men's Department, Spencer was followed by a younger man with curly hair wearing a flannel shirt who he believes was Gerald Waters, the Asset Protection manager for Bloomingdale's at that time.[2] Later, while considering the purchase of candles in the Clearance section, Spencer states that two Bloomingdale's employees paced behind him and watched him. Spencer decided not to buy any candles and left the store.

On December 30, 2016, Spencer returned several items to the Bloomingdale's store. His returns were scrutinized for several minutes by a Bloomingdale's sales associate who asked Spencer when he purchased the items and if he had worn them. Meanwhile, a Caucasian female customer in front of him was able to return her items without any delay. Despite the questioning by the Bloomingdale's sales associate, there is no dispute that the store accepted all of Spencer's returns.

On January 10, 2017, while shopping with his niece and sister, Spencer was followed and observed by an individual he believes to have been a Bloomingdale's employee. Spencer describes the individual as the same younger male with curly

---

2. Spencer described this individual as possibly of Hispanic origin, but the evidence shows that Waters is African American.

hair who had followed Spencer on December 28, who he believes to be Waters.  Spencer made one purchase that evening.

On January 13, 2017, while shopping in the Men's Department, Spencer was followed by a tall, bald African American male.  This man wore a flannel shirt, baggy jeans, and boots and carried a crumpled bag from another store.  Spencer believes this individual was a Bloomingdale's employee posing as a shopper.  This employee followed Spencer from department to department and stared at him "dead on."  When Spencer made a purchase, he spoke to an African American sales associate who was working at the cash register named Joy Houston.  Spencer asked Houston if the man following him was an Asset Protection employee and whether Spencer was being watched.  Houston responded that she was sorry that Spencer felt that way but that she did not see anything.[3]

On January 13, 2017, Spencer completed another online customer satisfaction survey in which he reported his perception that he was being subjected to ongoing racial profiling.

_____

3.  Spencer states that Houston confirmed that the individual with the crumpled shopping bag was an Asset Protection employee and that it was a shame that Spencer was being followed because "you're always in here buying stuff."  This recollection is contradicted by the deposition testimony of Houston, who repeatedly stated that she merely expressed empathy for Spencer and that she did not see anyone following him.  Nonetheless, we assume for purposes of this motion that someone was indeed following Spencer on this occasion and thus Houston's comments are irrelevant.

Several days after submitting that survey, on January 17, 2017,

Spencer decided to return several hundreds of dollars of

merchandise at a Bloomingdale's store in Willow Grove,

Pennsylvania instead of the King of Prussia store because of the

perceiving racial profiling.

On January 26, 2017, Spencer received a telephone call

from Cathy Muhlenforth, the General Manager of the

Bloomingdale's King of Prussia store, regarding his online

survey.  Muhlenforth expressed empathy for Spencer and stated

that Bloomingdale's took Spencer's complaints seriously.  She

also informed Spencer that there was a new Asset Protection

manager at the store.[4]

During discovery, Bloomingdale's produced its records

for all individuals who were stopped and/or detained for

shoplifting at the King of Prussia store from 2016 through 2017.

In 2016, 107 individuals were stopped and/or detained for

shoplifting and in 2017, there were 23 such individuals.  Of the

---

4.  Spencer stated that Muhlenforth informed him that the Asset
Protection manager had been terminated.  However, the evidence
shows that the manager Muhlenforth was referring to, Noah Bell,
was actually promoted into a different position with
Bloomingdale's in Orlando, Florida.  In opposition to
defendant's motion for summary judgment, Spencer also points out
that two asset protection employees of Bloomingdale's were
terminated in 2017 for falsifying an internal Bloomingdale's
document.  These terminations had nothing to do with allegations
of racial discrimination and thus are irrelevant to Spencer's
cause of action.

total 130 individuals who were stopped and/or detained for

shoplifting in 2016 and 2017, 72 individuals, that is, 55.38%,

were African American.  Thirty-one individuals, that is, 23.84%,

were Caucasian.  Eight individuals, that is, 6.15%, were Asian.

Six individuals, that is, 4.61%, were Latino.  Twelve

individuals, that is, 9.23%, were identified as "Other."

Of the 130 persons who were stopped and/or detained,

84 individuals were prosecuted.  Forty-eight of these

prosecutions, that is, 57.14%, were African American and 19 of

those prosecuted, that is, 22.62%, were Caucasian.[5]  There is no

evidence regarding which if any of these prosecutions resulted

in convictions.

---

5.  Gerald Waters, a Bloomingdale's asset protection employee,
reported that generally individuals were prosecuted if they were
suspected of stealing over $300 worth of merchandise or if they
attempted to fight with staff.  Spencer points out that 21 of
the African Americans prosecuted for shoplifting had a case
value of less than $300 and were not accused of fighting with
staff.  Three of the Caucasians prosecuted had a case value of
less than $300, although it is unclear whether they also fought
with staff.  It is uncertain whether Waters' statements
regarding prosecution reflect an official policy of
Bloomingdale's.  Moreover, Bloomingdale's records reflect that
Bloomingdale's decisions regarding prosecution were sometimes
based on other factors (for example, referring a minor to police
because no guardian could pick him up for several hours and
Bloomingdale's did not want to detain him for an unreasonable
amount of time).  These records also reflect that the case value
assigned by Bloomingdale's in the system did not always match
the amount of merchandise reported stolen in the narrative notes
regarding the arrest.  Accordingly, we will not consider this
aspect of the data.

III

In Count I of the complaint, Spencer asserts a claim against Bloomingdale's for violation of his civil rights under 42 U.S.C. § 1981. Section 1981 provides, among other things, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute was first enacted in 1866 and was amended in 1991 to define the right to "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). Section 1981 prohibits racial discrimination in "all phases and incidents of the contractual relationship." Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994). Moreover, courts construe the statute liberally to give effect to the broad remedial purpose it was intended to serve. See, e.g., Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001); Mahone v. Waddle, 564 F.2d 1018, 1030 (3d Cir. 1977).

To establish a prima facie case under § 1981, Spencer must show:  (1) that he is a member of a racial minority; (2) that Bloomingdale's intended to discriminate against him on the basis of race; and (3) that the discrimination abridged his

-10-

right to make and enforce a contract.  See Cedeno v. Wal-Mart

Stores, Inc., No. 98-479, 1999 WL 1129638, at *2 n.7 (E.D. Pa.

Nov. 30, 1999); Ackerman v. Food-4-Less, No. 98-1011, 1998 WL

316084, at *2 (E.D. Pa. June 10, 1998).

　　　　In Count II of the complaint, Spencer alleges a claim

for violation of his civil rights under 42 U.S.C. § 1982.

Section 1982 states:  "All citizens of the United States shall

have the same right, in every State and Territory, as is enjoyed

by white citizens thereof to inherit, purchase, lease, sell,

hold, and convey real and personal property."  To prevail on his

claim under § 1982, Spencer must establish that:  (1) he is a

member of a protected class; (2) he was intentionally

discriminated against by defendant; and (3) that such

discrimination interfered with his property rights.  Brown, 250

F.3d at 797; see also Shaare Tefila Congregation v. Cobb, 481

U.S. 615, 616 (1987).  Due to their similar wording and common

lineage, §§ 1981 and 1982 are traditionally construed in a

similar manner.  See CBOCS W., Inc. v. Humphries, 553 U.S. 442,

447 (2008) (citing Runyon v. McCrary, 427 U.S. 160, 173 (1976));

Cedeno, 1999 WL 1129638, at *2 & n.7.

　　　　A review of cases dealing with alleged discrimination

in the retail setting makes clear that the evidence proffered by

Spencer is insufficient to proceed past summary judgment.  For

example, in Cedeno v. Wal-Mart Stores, Inc., this court granted

summary judgment in favor of defendant Wal-Mart on claims brought under §§ 1981 and 1982. 1999 WL 1129638, at *1. There, the plaintiffs, who were Hispanic, had been asked to leave a Wal-Mart store after a member of their party engaged in shoplifting and were told by a Wal-Mart employee that "Spanish people come here to steal." Id. at *1 & n.2. The plaintiffs returned to the store a week later despite Wal-Mart's instructions to not return. Id. at *1. Plaintiffs were then prosecuted for shoplifting and trespassing, although the charges were later nolle prossed. Id. The court concluded that one isolated comment against plaintiffs' race, although reprehensible, could not convert otherwise reasonable conduct by Wal-Mart into racial discrimination. Id. at *2.

In Ackaa v. Tommy Hilfiger Co., African American plaintiffs produced evidence that security guards in a retail store followed them closely as they shopped, that the guards in question had a history of using racial epithets, and that the store had received numerous complaints from black customers in the past regarding racially offensive behavior by the same security guards. No. 96-8262, 1998 WL 136522, at *3-4 (E.D. Pa. Mar. 24, 1998). Further, the defendants did not deny that they had closely scrutinized plaintiffs, the only black customers in the store, as they shopped. Id. at *4. The court concluded that such evidence was sufficient to raise a genuine dispute of

material fact on whether defendants intentionally discriminated against plaintiffs in violation of § 1981.  Id. at *5.  However, the court ultimately granted summary judgment in favor of defendants on plaintiffs' 1981 claim on the ground that plaintiffs had not demonstrated that defendants' discriminatory actions impaired their rights to make and enforce contracts under § 1981.  Id. at *6.  The court reasoned that plaintiffs had finished their shopping for that day before they were ejected from the store and there was no evidence that plaintiffs were barred from reentering the store.  Id.

In Ackerman v. Food-4-Less, an African American plaintiff was grabbed and detained by store security for more than two hours on suspicion of shoplifting.  1998 WL 316084, at *1-2.  During this time, plaintiff was refused access to the bathroom and, as a result, defecated in her pants.  Id. at *2. The store security guard who detained plaintiff also directed numerous racial slurs at her, including a statement that Puerto Ricans are always stealing and that she could not be married to the man she identified as her husband because he was white.  Id. The court concluded based on these allegations that plaintiff had stated a claim for relief sufficient to defeat defendant's motion to dismiss.  Id. at *2-4.  Similarly, in Bethea v. Michael's Family Restaurant and Diner, the court denied the motion to dismiss of the defendant restaurant where the

plaintiffs had not only received inferior service but also had been subjected to racially-charged comments by restaurant employees.  No. 00-6216, 2001 WL 722566, at *2-3 (E.D. Pa. June 26, 2001).

These cases demonstrate that Spencer has not come forward with sufficient evidence to defeat summary judgment on his claims under §§ 1981 and 1982.  Spencer concedes that he was never stopped, detained, arrested, questioned, searched, or otherwise accused of theft while shopping at Bloomingdale's.  No employee or agent of Bloomingdale's ever made any comment to Spencer about race.  Spencer made numerous purchases and returns at Bloomingdale's and was never refused any specific transaction or barred from entering the store.  Spencer merely asserts that he was followed or watched by individuals who he identifies as employees of Bloomingdale's.  Many of these employees never spoke with Spencer at all or came closer than a few feet away from him.  These events are simply insufficient to raise a genuine dispute of material fact to allow his discrimination claims under §§ 1981 or 1982 to proceed.

Discriminatory intent "can manifest [itself] in disparate impact, departure from procedural norms, a history of discriminatory conduct, or other relevant facts, but may not be established by conclusory allegations of generalized racial bias."  Bailey v. Harleysville Nat. Bank & Tr. Co., No. 04-1541,

2005 WL 2012024, at \*5 (E.D. Pa. Aug. 22, 2005) (citing <u>Flagg v.</u> <u>Control Data</u>, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992)).  Here, discovery has not yielded any specific example of racial profiling or other discrimination by Bloomingdale's against any other African American customer at its King of Prussia store.[6] Instead, the undisputed evidence shows that Bloomingdale's maintains an anti-profiling policy and customer bill of rights which prohibits discrimination or harassment on the basis of race.  As noted above, Spencer has not come forward with evidence of any racially discriminatory comment by a Bloomingdale's employee or any other behavior by Bloomingdale's employees that could be interpreted as evidencing an intent to discriminate on the basis of race.

   All Spencer has put forth is his conclusory allegation that the perceived surveillance and inferior customer service was due to his race.  At this stage of the proceedings, the fact of Spencer's race alone cannot give rise to an inference that Bloomingdale's acted with discriminatory intent.  <u>See</u> <u>Bailey</u>, 2005 WL 2012024, at \*5.

---

6.  Spencer points out that sales associate Joy Houston stated in her deposition that she believes loss prevention personnel at Bloomingdale's engage in racial profiling.  Houston admitted that this belief was based on general observation and not any conversations she had with loss prevention, and that she is not trained in loss prevention.  She also stated in her deposition that loss prevention monitored people of all races and that she was not aware of any instance of racial profiling at Bloomingdale's.

In opposition to Bloomingdale's motion for summary judgment, Spencer points to statistics maintained by Bloomingdale's for 2016 and 2017 regarding individuals stopped and/or detained for shoplifting on store property. Statistics, when bolstered by other evidence, may establish a prima facie case of racial discrimination. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 276 (3d Cir. 2014) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 338-40 (1977)). However, the "usefulness [of statistics] depends on all of the surrounding facts and circumstances." Id. (quoting Int'l Bhd. of Teamsters, 431 U.S. at 340). The court is not "obliged to assume that plaintiffs' statistical evidence is reliable" and may consider the strength of the data set as well as the statistical techniques utilized. Id. (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996 (1988)). Any statistical disparities must be "sufficiently substantial" to raise an inference of discrimination. Id. (citing Watson, 487 U.S. at 995).

In support of his case, Spencer has offered nothing more than raw data which shows that more African Americans than Caucasians were stopped and/or detained for shoplifting during 2016 and 2017. This data simply establishes that a majority of the individuals stopped and/or detained were African American. Although Spencer asserts that "black customers fared even worse

-16-

when it comes to prosecutions," the evidence shows that the percentages of African Americans and Caucasians who were prosecuted for shoplifting were roughly equal to the percentages of those races who were stopped and/or detained.  Specifically, 55.38% of individuals stopped and/or detained were African American and 23.84% were Caucasian.  Of the individuals who were then prosecuted, 57.14% were African American and 22.62% were Caucasian.

There is no evidence regarding the race of individuals who entered the store during those years and thus no way to discern if these figures were truly disproportionate to the number of shoppers of those races overall.[7]  There is also no evidence regarding whether the individuals prosecuted ultimately were convicted of theft.  Thus, Spencer's comparison of percentages of Caucasian and African American individuals stopped and/or detained for shoplifting is not informative. See, e.g., Shipley v. First Fed. Sav. & Loan Ass'n of Del., 703 F. Supp. 1122, 1136 (D. Del. 1988).  Moreover, Spencer has not demonstrated through expert evidence or other reliable techniques that the disparities between races are truly statistically significant.  See, e.g., Meditz v. City of Newark,

---

7.  For example, Joy Houston testified that the majority of shoppers in the Bloomingdale's Men's Department were African American.

658 F.3d 364, 371-72 & n.13 (3d Cir. 2011). For all of these reasons, this data alone is insufficient to defeat summary judgment.[8]

In conclusion, Spencer has not shown that genuine disputes of material fact exist so as to allow him to proceed to trial. Therefore, the motion of defendant Bloomingdale's for summary judgment will be granted.

---

8. We also note that because Spencer was never stopped or otherwise accused of shoplifting, evidence regarding individuals who were stopped and/or detained and who were prosecuted is of limited relevance to his case.